Donald Z. Gray [ISB #10070]
Marcus H. Waterman [ISB #12004]
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701-2720
Office: (208) 388-1200
Fax: (208) 388-1300
dongray@givenspursley.com
mhw@givenspursley.com

Lisa J. Damiani, admitted pro hac vice
Damiani Law Group A.P.C.
1059 10th Avenue
San Diego, CA 92101
Office: 619-239-0170
Fax: (619) 239-0216
LJDamiani@damianilawgroup.com
[18924848.1] 18074-1

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| PROMO SHOP, INC., a California Corporation,<br><br>       Plaintiff,<br><br>    v.<br><br>JACKALOPE, INC., an Idaho entity;<br>JACKALOPE, LLC, an Idaho entity,<br><br>       Defendants. | Case No. 1:25 CV-00094-AKB<br><br>**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION** |

Defendants Jackalope, Inc., and Jackalope, LLC (collectively, **"Jackalope"**), by and through their attorneys of record, GIVENS PURSLEY LLP, hereby submit this Response to Motion for Preliminary Injunction.

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 1**

# I.    INTRODUCTION

Plaintiff moves this Court for a preliminary injunction more than a full year after the alleged conduct occurred, requesting that this Court enjoin Defendants from using purported trade secrets. First, there is no emergency. Second, there are no trade secrets. Third, there is no irreparable harm. For the reasons set forth below, this Court should deny Plaintiff's motion.

# II.    BACKGROUND

## A.    The promotional marketing industry does not involve trade secrets.

The promotional marketing industry involves three main categories of players: (1) suppliers; (2) distributors; and (3) end-users. Declaration of Kris Robinson in Support of Response to Motion for Preliminary Injunction (**"Robinson Decl."**), ¶ 2. A distributor (1) works to identify companies/clients that can utilize branded merchandise to better promote their business, (2) works with those companies, and its suppliers, to identify creative promotional materials to best achieve the client's goals, and (3) works with suppliers to fulfill those orders. *Id.* ¶ 3.

Distributors order promotional products from several suppliers, including PCNA, Gemline, Hit Promo, and SanMar. Robinson Decl., ¶ 5. These companies advertise their bulk pricing rates, shipping details, production fees, extra charges, and terms of service directly on their websites. *Id.*

Clients within the promotional marketing industry are relationship driven. *Id.* ¶ 8. Most companies that purchase promotional materials rely on their account executive to understand their business, their needs, and most importantly, their end consumers. *Id.*

## B.    Kris Robinson grew up and built his career in Boise.

Kris Robinson ("**Robinson**") started in the promotional marketing industry in 1994, when he started working for Idaho Man, Inc. ("**Idea Man**"), which was based in Los Angeles. Robinson Decl., ¶ 9. In or around 1997, Robinson moved back to his hometown of Boise, Idaho, and opened an office for Idea Man in Boise to better leverage his personal connections. *Id.* At that time,

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 2**

Robinson was working with, among other Boise-based companies, a very large and successful company ("**Company ABC**")[1]. *Id.* During his time at Idea Man, Robinson also worked with Guillermo "Memo" Kahan ("**Kahan**"), who was based in Idea Man's Los Angeles office. *Id.* ¶ 11.

**C.    Robinson started with PromoShop in 2002.**

In or around April 2002, Robinson was approached by Kahan to join PromoShop, Inc.'s ("**PromoShop**") team. *Id.* ¶ 14. PromoShop was a California-based promotional company that Kahan founded. After Robinson joined PromoShop, he continued to work in Boise and service his Idaho based clients. *Id.* ¶ 15. He did not work out of PromoShop's Los Angeles office. *Id.*

In 2018, Robinson moved into the role of sales manager, in which he helped PromoShop land many large national clients, including PVH, HBO, JetBlue, and VANs Shoes. *Id.* ¶ 20. As PromoShop's sales manager, Robinson was in charge of managing its account executives, including Greg White, who oversaw the VANs Shoes account. *Id.* ¶ 21. In 2018, Greg White left PromoShop. *Id.* After he did so, Kahan took the position that PromoShop should not aggressively attempt to maintain the VANs Shoes account because he told Robinson that clients almost always follow their account executives. Robinson Decl., ¶ 21.

**D.    Robinson leveraged his personal connections to land big clients for PromoShop.**

In 2022, Robinson continued to leverage his relationship with Company ABC and proposed that PromoShop become Company ABC's agency of record for its new brand launch. Robinson Decl. ¶ 25. Robinson, with the help of his Boise team, created a global launch kit for Company ABC that resulted in PromoShop being awarded several million dollars in work.

---

[1] The identify of this company is being kept confidential to ensure compliance with a master services agreement currently in place between this company and Jackalope, Inc.

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 3**

**E.      Robinson formed Jackalope, LLC because he liked the name for a future company.**

In June 2023, Robinson formed Jackalope, LLC. Robinson Decl. ¶ 26, Ex. 1. He did so because he liked the name and knew that one day he would likely start his own distributing company as he had dreamed of doing since at least 2015. *Id.* Robinson never once used Jackalope, LLC to compete with PromoShop. *Id.*

**F.      Robinson and Kahan's relationship deteriorated over the years.**

Robinson and Kahan's relationship began to sour. Robinson Decl. ¶ 23. It was not uncommon for Kahan to yell at and belittle Robinson. *Id.* Despite Robinson's success for PromoShop and the large amount of business he brought to the company, Kahan always seemed to treat Robinson terribly. *Id.* Robinson often felt that Kahan wanted him out of the company. *Id.*

In 2019, Kahan attempted to push Robinson out and have one of the account executives (Wendy Wheeler) take over his book of business. Robinson Decl. ¶ 24. When this was unsuccessful, Wheeler left PromoShop to take a position with Proforma, a competitor of PromoShop. *Id.* Wheeler took several large clients away from PromoShop. *Id.* Kahan again took the position that clients follow relationships. Robinson Decl. ¶ 24.

On or around August 15, 2023, Robinson attended a regional tradeshow with Kahan in San Deigo, California. Robinson Decl. ¶ 27. During that trip, Kahan and Robinson got into a heated argument, during which Robinson told Kahan that he thought it may be best to start discussing a strategy for Robinson to leave the company. *Id.* On August 21, 2023, Kahan emailed Robinson, and among other things, agreed. Robinson Decl. ¶ 28; Ex. 2.

After their argument in San Diego, Robinson returned to Boise and further contemplated leaving PromoShop, but he did not want to do so until at least quarter two of 2024 as he had too much work in progress. Robinson Decl. ¶ 29. Robinson wanted his team to continue to operate business as usual on behalf of PromoShop and continue to put PromoShop's clients first. *Id.* During

the last four months of 2023, Robinson booked over $2 Million in sales for PromoShop. *Id.* ¶ 30. Robinson never once attempted to delay or divert work away from PromoShop. *Id.*

**G.    Kahan essentially pushed Robinson out of PromoShop.**

On Saturday, January 13, 2024, Robinson met with Kahan at the annual PPAI Expo in Las Vegas. Robinson Decl. ¶ 31. On that day, Kahan told Robinson that Robinson was no longer on PromoShop's executive or management team. *Id.* Kahan also told Robinson that he could not attend certain meetings and events on behalf of PromoShop. *Id.* Kahan concluded their conversation by asking that Robinson tell Kahan his plan for moving forward by that following Tuesday. *Id.* Immediately after his meeting with Kahan, Robinson's access to PromoShop's computer system was suspended. *Id.* After his meeting with Kahan, Robinson decided that rather than seek employment with another distributor, he would start his own promotional company. Robinson Decl. ¶ 32.

On Tuesday, January 16, 2024, Robinson met with Kahan and PromoShop's President, Kate Alavez, in the Mandalay Bay Convention Center parking lot. Robinson Decl. ¶ 33. Robinson told them that he intended to start his own promotional company, that his team would likely be joining him, and that Kimberly Luxenberg and Courtney Lissauer would also likely be joining him. *Id.* During this conversation, Robinson said that he wanted to continue to work with PromoShop until the end of the month (January 2024) to continue to place orders through PromoShop for their clients. *Id.* Both Kahan and Alavez agreed with this approach. *Id.* ¶ 33. That afternoon, Robinson sent an email to Kahan confirming their agreement. *Id.* ¶ 34; Ex. 3.

After Robinson informed Kahan that he would be leaving PromoShop, he reached out to some of his key clients, including Company ABC, utilizing the contact information within his personal cellphone. Robinson Decl. ¶ 35. Robinson informed his clients that he was leaving PromoShop to start his own business. *Id.* During his discussions with Company ABC, Robinson

and the company representative discussed PromoShop continuing to fulfill all orders in progress. *Id.* ¶ 36. Company ABC also made it clear that it wanted to move all new business to Robinson's new company once he had it up and running. *Id.*

On January 17, 2024, while Robinson still did not have access to PromoShop's computer system, Kahan sent out a company-wide email informing all employees that Robinson was no longer affiliated with PromoShop. Robinson Decl. ¶ 37; Ex. 4.

**H.    Robinson formed Jackalope, Inc. when it was clear he was done with PromoShop.**

On January 18, 2024, Robinson asked his business attorney to dissolve Jackalope, LLC and incorporate Jackalope, Inc. Robinson Decl. ¶¶ 39, 41; Exs. 5 and 6.

**I.    PromoShop cut off access to its email and computer systems and interfered with Robinson's and other employees' abilities to fulfill PromoShop's clients' orders.**

On January 17, 2024, PromoShop cut off access to the email accounts of Kylie Daniels, Courtney Lissauer, Kimberly Luxenberg, and Danya Mitchel. Robinson Decl. ¶ 38.

On January 19, 2024, PromoShop turned back on Robinson's and his team's access to PromoShop's computer system. Robinson Decl. ¶ 40. During this time, Robinson's team inputted several orders into the PromoShop system so that PromoShop's clients could have their orders fulfilled. *Id*. ¶ 40. By 5:00 pm PST, PromoShop had once again disabled their access. *Id.*

Over the next several days, PromoShop interfered with Robinson's, and his team's, ability to conduct business on behalf of PromoShop. Robinson Decl. ¶ 42. PromoShop did not allow Robinson and his team to finish current projects, access the network, or administer new projects. *Id.* PromoShop told Robinson's clients that he and his team were no longer employed with PromoShop. *Id.* ¶ 37; Ex. 7.

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 6**

**J.    Robinson and his team resigned and/or were fired from PromoShop.**

On Tuesday, January 23, 2024, PromoShop terminated Kimberly Luxenberg. Declaration of Kimberly Luxenberg in Support of Response to Motion for Preliminary Injunction ("**Luxenberg Decl.**"), ¶ 14. On Thursday, January 25, 2024, Robinson resigned from PromoShop. Robinson Decl. ¶ 44. On the same day, Courtney Lissauer and Kylie Daniels also resigned. Declaration of Courtney Lissauer in Support of Response to Motion for Preliminary Injunction ("**Lissauer Decl.**"), ¶ 17; Declaration of Kylie Daniels in Support of Response to Motion for Preliminary Injunction ("**Daniels Decl.**"), ¶ 10.

**K.    After Robinson and his team left PromoShop, they did not utilize any confidential or proprietary information to compete with PromoShop.**

When Robinson and his team left employment with PromoShop, they did not retain any confidential or trade secret information on behalf of PromoShop. Robinson Decl. ¶ 45.  Robinson started Jackalope, Inc. with nothing but his institutional knowledge and his personal relationships that he had been building for the last thirty years. Robinson Decl. ¶ 45. After he left PromoShop, Robinson continued to reach out to his clients by utilizing the contacts in his personal cellphone. Robinson Decl. ¶ 46. PromoShop never demanded that he return or erase the contact information held within his personal cellphone, nor did PromoShop ever prohibit its employees from keeping client contact information on personal cellphones. *Id.*

Jackalope, Inc. did not start doing business until February 1, 2024. Robinson Decl. ¶ 47. After they started doing business as Jackalope, Inc., Robinson and his team never once intentionally represented that they were affiliated in any way with PromoShop. Robinson Decl., ¶ 48. Instead, they informed their clients, suppliers, and factories that they were a new, separate company. *Id.* Since Robinson and his team left PromoShop, they have never once asked or told a

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 7**

client to stop working with PromoShop. Robinson Decl. ¶ 49. They have also never asked a client to cancel any order with PromoShop. *Id.*

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes courts to issue preliminary injunctions under certain limited circumstances. The party moving for a preliminary injunction bears a heavy burden. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). A preliminary injunction "may go no further than necessary to provide interim relief to the parties," and should not be "more burdensome to the defendant than necessary to [redress] the plaintiff's injuries." *Labrador v. Poe by & through Poe*, ⸺ U.S. ⸺, 144 S. Ct. 921, 921-23 (2024) (Gorsuch, J., concurring).

To obtain a preliminary injunction, a plaintiff must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Idaho Organization of Resource Councils v. Labrador*, ⸺F.Supp.3d⸺, 2025 WL 1237305, at *9 (D. Idaho April 29, 2025) (citing *Winter*, 555 U.S. at 20). Because a preliminary injunction is a "drastic remedy," the movant must make "a clear showing" as to each element. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

The Ninth Circuit has adopted a "sliding scale variant of the *Winter* test," called the "serious questions test." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (cleaned up). Under this test, a plaintiff is entitled to a preliminary injunction if it "demonstrates (1) serious questions going to the merits, (2) a likelihood of irreparable injury, (3) a balance of hardships that tips sharply towards the plaintiff, and (4) the injunction is in the public interest." *Id.* (cleaned up). A "serious question" is one "that cannot be resolved one way or the other at the hearing on the injunction because [it] require[s] more deliberative investigation."

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 8**

*All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023) (cleaned up). But a serious question "does not exist where the plaintiff's claim is merely plausible or just because there are legal questions not directly answered by past precedent." *Id.* (internal quotations marks omitted).

## IV.    ARGUMENT

PromoShop has not established that it is likely to succeed or that there are serious questions as to the merits of its misappropriation claims. Nor has it pointed to any non-speculative threat of irreparable harm that would require immediate, preliminary relief.

Jackalope did not steal or misappropriate PromoShop's confidential or trade secret information. And, for the past fifteen months, Jackalope has worked to develop its own relationships with customers and suppliers and expand its presence in the marketplace. There is no reason it should not be allowed to continue doing so while this case is litigated.

**A.    PromoShop is not likely to succeed on the merits of its claims.**

The likelihood of success is the "most important" factor in the preliminary injunction analysis. *N. D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024). "A plaintiff cannot point to amorphous questions of law across her pleadings as grounds for an injunction; a plaintiff must show a likelihood of success in proving the claim at issue in her preliminary injunction." *Sethunya v. College of Western Idaho*, Case No. 1:24-cv-00007-AKB, 2025 WL 1362961, at *2 (D. Idaho May 8, 2025) (citing *All. for the Wild Rockies*, 68 F.4th at 496–97). Likewise, under the "serious questions" test, a merely plausible or uncertain outcome is not enough to warrant a preliminary injunction. *All. for the Wild Rockies*, 68 F.4th at 497.

PromoShop has not made this showing. First, a number of its allegations are not relevant to its misappropriation claims. Second it has not established the existence of any trade secrets. And, third, the evidence does not substantiate misappropriation.

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 9**

### 1.    A number of PromoShop's allegations are irrelevant to its motion.

PromoShop's Motion for Preliminary Injunction is based solely upon its claims for misappropriation of trade secrets. *See generally* Motion for Preliminary Injunction, Dkt. 25. To prevail on those claims, PromoShop must establish that a trade secret existed and that Jackalope acquired, disclosed, or used the trade secret through improper means. *BigRentz, Inc. v. KGM Enterprises, LLC*, Case No. 1:22-cv-00430-AKB, 2023 WL 7496726, at \*2 (D. Idaho Nov. 13, 2023). Only evidence that bears upon these elements is relevant to PromoShop's Motion.

Several of the allegations featured in PromoShop's Memorandum in Support of Motion for Preliminary Injunction (**"Opening Brief"**) are irrelevant. These include the claim (1) that Robinson submitted a "fraudulent expense report" on December 31, 2023, Opening Brief at 4; (2) that Daniels solicited PromoShop's customers by providing a flyer that blurred the lines between PromoShop and Jackalope, *id.* at 8–9; (3) that Robinson performed a factory reset on his laptop before returning it to PromoShop, *id.* at 8; and (4) that Luxenberg requested access to personal files on her work computer on January 17, 2024, Declaration of Kate Alavez in Support of Plaintiff's Motion for Preliminary Injunction (**"Alavez Decl."**) ¶ 29, Ex. 9.

These allegations simply do not bear upon whether a trade secret existed or whether Jackalope acquired, disclosed, or used such trade secret through improper means. And they should not be considered for purposes of deciding whether to impose a preliminary injunction.

### 2.    PromoShop has not established the existence of any trade secrets.

Turning to the first element of a misappropriation claim, PromoShop has not demonstrated the existence of any trade secrets. "Trade secret" means "information, including a formula, pattern, compilation, program, computer program, device, method, technique, or process," that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 10**

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. [ . . . ]

Idaho Code § 48-801(5); *see also BigRentz, Inc.*, 2023 WL 7496726, at *2 (explaining that "[c]ourts have analyzed claims brought under the [federal Defend Trade Secrets Act] and state trade secret acts, such as the [Idaho Trade Secrets Act], together because the elements are substantially similar.").

In its Opening Brief, PromoShop refers to numerous broad categories of information that it claims constitute trade secrets. *See* Opening Brief at 2 (identifying fifteen broad categories of "confidential" information), 6 (stating PromoShop's trade secrets "include, but are not limited to" twelve broad categories of information). But, aside from its allegation that Jackalope downloaded and "stole" broad swaths information—an allegation disproven below—PromoShop has identified just four specific kinds of information that it claims Jackalope misappropriated: customer identities, *id.* at 7, supplier identities, *id.* at 7–8, customer contact information, *id*, and PromoShop's Shopify login credentials, *id.* at 8. None constitute trade secrets.

First, the identities of PromoShop's customers are not trade secrets. A customer list may be a trade secret "if it is not generally known to or readily ascertainable by others and if it is subject to reasonable efforts to maintain its secrecy." *BigRentz, Inc.*, 2023 WL 7496726, at *2 (internal citations omitted). Neither is true here. The identities of many PromoShop customers are generally known and easily ascertainable. For example, PromoShop prominently displays the names of numerous customers on its publicly accessible website. Robinson Decl. ¶ 50, Ex. 8. And PromoShop's own CEO identifies forty-two of its customers by name in his own declaration. *See* Declaration of Guillermo Kahan in Support of Plaintiff's Motion for Preliminary Injunction (**"Kahan Decl."**) ¶ 4. Moreover, PromoShop has not made reasonable efforts to conceal its customers' identities. PromoShop allows its employees to freely disclose customer identities for a

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 11**

number of reasons, including to solicit new clients, work with suppliers, and network at trade shows. Lissauer Decl. ¶ 11; Luxenberg Decl. ¶ 8. Since at least 2015, such disclosures by PromoShop's account executives have been routine and commonplace. *Id.*

Likewise, the identities of PromoShop's suppliers are not trade secrets. Ten of PromoShop's suppliers are identified on its website. Robinson Decl. ¶ 52, Ex. 10. And, as with its customers' identities, PromoShop has always allowed employees to freely disclose its suppliers' identities for a variety of reasons. Lissauer Decl. ¶ 11; Luxenberg Decl. ¶ 8. PromoShop's transparency in this respect is not unique in the promotional merchandising industry. Indeed, anyone with internet access can easily identify the key suppliers operating in the promotional marketing industry by visiting the websites of the industry's two prominent industry associations: the Advertising Specialty Institute (ASI) and the Promotional Products Association International (PPAI). Robinson Decl. ¶¶ 4, 52. PromoShop would derive no "independent economic value" from keeping its list of suppliers confidential—which, perhaps, explains why it has made no attempt to do so, Lissauer Decl. ¶ 11; Luxenberg Decl. ¶ 8. *See* Idaho Code § 48-801(5)(a) (defining "trade secrets" to include only information that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means").

Third, the customer contact information in personal cellphones is not a trade secret. Following their resignations from PromoShop, Robinson and Luxenberg reached out to inform many of their former clients that they had moved to a new company. Robinson Decl. ¶ 35; Luxenberg Decl. ¶ 16. In doing so, each utilized contact information contained on his or her own personal cellphone. *See id.* Neither Robinson nor Luxenberg obtained the customer contact information from any database belonging to PromoShop. *Id.*

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 12**

Similar facts were present in *BigRentz, Inc. v. KGM Enterprises, LLC*, 2023 WL 7496726, at *3. There, this Court denied a request for a preliminary injunction after finding insufficient evidence that customer contact information on the defendant's cellphone was a trade secret. *Id.* (denying preliminary injunction in misappropriation case where defendant testified that he "used the [customer] contact information in his cellphone, not from [plaintiff's] customer database"); *see also Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 166 Idaho 132, 150, 456 P.3d 201, 219 (Idaho 2019) (holding that that former employee's cell phone contact list was not a trade secret). Although the defendant had agreed he would "not disclose or use 'information relating to customers,'" there was no evidence that the employer "demanded [that he] return a company cellphone, delete his cellphone contacts, or otherwise ensure [he] did not continue to possess its customers' contact information after his employment terminated." *Id.*

Here, as in *BigRentz*, PromoShop does not prohibit its employees from keeping customer contact information on their personal cellphones. Robinson Decl. ¶ 46; Luxenberg Decl. ¶ 16. Nor did it ever demand that Robinson or Luxenberg return or erase that information when they left PromoShop. *Id.* Indeed, such a request would have been absurd. Robinson and Luxenberg have spent their careers developing relationships with customers in this industry. Robinson Decl. ¶ 8; Luxenberg Decl. ¶¶ 6–7. Many of their customers are more than clients—they are friends and personal acquaintances. Robinson Decl. ¶ 8. Trade secret laws do not require the employees to scrub every personal and professional relationship from their memory—or their cellphones—when they change employment. *See BigRentz, Inc.*, 2023 WL 7496726, at *3 (citing *Northwest Bec-Corp v. Home Living Serv.*, 136 Idaho 835, 840, 41 P.3d 263, 268 (Idaho 2002)).

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 13**

Finally, PromoShop's Shopify password is not a trade secret.[2] While passwords are valuable as a "security mechanism designed to control access to information," they "have no *independent* economic value" and therefore are not trade secrets. *State Analysis, Inc. v. American Financial Services Assoc.*, 621 F.Supp.2d 309, 321 (E.D. Va. 2009) (emphasis in original); *see also NRA Group, LLC v. Durenleau*, Civil No. 1:21-CV-00715, 2023 WL 8789992, at *12–13 (M.D. Pa. Dec. 19, 2023) (appeal pending) (concluding passwords were not trade secrets because they lacked independent economic value); *North Star Media, LLC v. Winogradsky-Sobel*, CV 11-466 PSG (CWx), 2011 WL 13220157, at *10–11 (C.D. Cal. May 23, 2011) (same). PromoShop's Shopify password lacks independent economic value and, therefore, is not a trade secret.

The first step to succeeding on a misappropriation claim is establishing the existence of a trade secret. PromoShop has not done so. And its Motion should be denied on this basis alone.

### 3.    There is no evidence of misappropriation.

Next, there is no evidence of misappropriation. "[M]isappropriation of a trade secret occurs when a person, who knows or has reason to know the trade secret was acquired by improper means, acquires the trade secret or when a person with the requisite knowledge of the trade secret uses or discloses it without express or implied consent." *BigRentz, Inc.*, 2023 WL 7496726 at *2 (citing Idaho Code § 48-801(2) and explaining that the elements of a federal misappropriation claim are "substantially similar"). Thus, to succeed on its claims, PromoShop must show that Jackalope "acquired, disclosed, or used" a trade secret through improper means. *Id.*

PromoShop claims that Jackalope misappropriated trade secrets by (a) stealing computer folders and files containing PromoShop's information, Opening Brief at 5–7, (b) using PromoShop's customer order information to divert business to Jackalope, *id.* at 7, (c) using

---

[2] Shopify is a commerce platform that facilitates and manages orders.

PromoShop's supplier information to compete with PromoShop, *id.* at 7–8, (d) using PromoShop's Shopify login information to divert business to Jackalope, *id.* at 8, (e) deleting PromoShop's "Confidential Information," *id.*, and (f) using PromoShop's customer contact information to solicit business for Jackalope, *id.* at 8–9. These allegations are not supported by evidence.

**(a)     Jackalope did not steal PromoShop's files or folders.**

Daniels and Lissauer did not "steal" any computer files or folders from PromoShop. Relying on the testimony of Michael Kunkel, a forensic examiner, PromoShop paints a menacing portrait of Daniels and Lissauer racing to commit a covert and "large-scale theft" of PromoShop's information. Opening Brief at 4. As is often the case, the truth is not so dramatic.

PromoShop's grand narrative can be broken down into a few component parts. First, PromoShop claims that Lissauer improperly transferred PromoShop's files to her personal Google Drive account. But Lissauer had been using Google Drive with PromoShop's blessing since she started with PromoShop in 2015. Lissauer Decl. ¶ 8. She did so because PromoShop did not have a server or cloud-based storage system and she wanted to be sure her files would not be lost if her computer was lost or damaged. *Id.* PromoShop was fully aware that Lissauer used her personal Google Drive in conjunction with her work for PromoShop—indeed, its own IT department helped Lissauer with the account on occasion. *Id.* With this background, the fact that Kunkel's analysis revealed "1,845 unique references to Google Drive folders and files accessed from Lissauer's computer" is not surprising. Declaration of Michael Kunkel in Support of Plaintiff's Motion for Preliminary Injunction (**"Kunkel Decl."**) ¶ 9. And it certainly does not suggest any nefarious activity or misappropriation of trade secrets.

Next, PromoShop claims Daniels downloaded "hundreds of PromoShop computer folders and files" to a TOSHIBA hard drive on January 17 and 18, 2024. Opening Brief at 4. Again, context really matters. On January 17, 2024, Daniels was told that her access to PromoShop's

network and email account was going to be shut off. Daniels Decl. ¶ 5. At the time, Daniels was still an employee of PromoShop and had no definite plans to leave the company. *Id.* ¶ 4-6. Daniels was understandably upset. *Id.* She knew her inbox contained dozens of unread emails from clients inquiring about their order. *Id.* And without access to her files and emails, Daniels would not be able to respond to those questions or service PromoShop's customers. *Id.* So, Daniels used an external hard drive to copy materials from her work laptop, including some personal files and what she thought she would need to meaningfully fulfill the orders she had in progress for PromoShop's clients. *Id.* For the same reason, Daniels also informed some customers that they could reach her at her personal email address. *Id.* ¶ 8. Daniels did not "steal" PromoShop's information. She simply attempted—while actively doing business as an employee of PromoShop—to ensure continuity for PromoShop's customers in the face of an abrupt loss of access.

Finally, PromoShop claims that Lissauer stole its trade secrets when, on January 27, 2024, she used her work computer to accessed a single file on a SEAGATE hard drive titled "Courtney Lissauer EAE Offer Letter 2023.09.07.pdf." *See* Kunkel Decl. ¶¶ 8, 16(b). That was a letter provided to Lissauer by PromoShop that outlined her commission structure relating to her work with Elaine Parker, another account executive. Lissauer Decl. ¶ 18, Ex. 1. The fact that Lissauer downloaded this single file before returning her laptop lends no support to PromoShop's misappropriation claims.

### (b)    Jackalope did not use PromoShop's customer order information to divert business away from PromoShop.

Next, PromoShop claims Daniels channeled its customers to her private email account by falsely stating that "PromoShop's 'emails are down.'" Opening Brief at 7. PromoShop's selective quotation of Daniels' January 25 email is inaccurate. Daniels told the customer that "my emails are down," Alavez Decl., Ex. 11 at 1; not, as PromoShop suggests, that "PromoShop's 'emails are

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 16**

down,'" Opening Brief at 7. Indeed, Daniels' emails *were* down in the days leading up to January 25, 2024. Daniels Decl. ¶¶ 5–8. And she provided the client with her personal email address for that very reason. *Id.* ¶ 8.

### (c) Jackalope did not use supplier information to compete with PromoShop.

PromoShop claims Daniels forged a letter purporting to be from a customer that directed one of PromoShop's suppliers to only do business on the customer's behalf with Jackalope in the future. Opening Brief at 7–8. PromoShop fails to mention that, on January 29, 2024, it asked the purported author of the letter "to confirm the letter is authentic," *see* Kahan Decl., Ex. 2, to which the customer unambiguously responded: "Yes, that letter is authentic." Declaration of Lisa Damiani in Support of Response to Motion for Preliminary Injunction, ¶ 6, Ex. 3. PromoShop has not explained why the customer would lie about its authorship of the letter, and Kunkel's conclusory statement that the "metadata indicates the letter was created by Kylie Daniels" is of little help, Kunkel Decl. ¶ 15.

### (d) PromoShop's allegations about the Shopify account are baseless.

PromoShop next claims that Daniels used PromoShop's Shopify login credentials to "re-route" a customer's order information from PromoShop to Jackalope. Opening Brief at 8. This is simply not true. Daniels linked the Shopify account to her personal email for the sole purpose of providing one of PromoShop's clients with an update on its order. Daniels Decl. ¶ 9.

On January 25, 2024, while Daniels was still employed by PromoShop, a significant client requested an update on the shipping status of its order with PromoShop. Daniels Decl. ¶ 9. To provide that information, Daniels needed to access the Shopify account linked to her PromoShop email. *Id.* When she attempted to log into the Shopify account, the two factor authentication system sent a unique code to her PromoShop email account, which she could not access. *Id.* So, she linked

the Shopify account to her personal email address, enabling her to download a shipping report and answer the client's question. *Id.* When Daniels linked her personal email to the Shopify account, Shopify's system automatically alerted Katy Alavez, who immediately called Daniels. *Id.* Daniels explained what she had done and why she needed to access the account. *Id.* And that was that.

> (e)    **The factory reset of Robinson's computer does not support PromoShop's request for a preliminary injunction.**

Next, PromoShop claims it permanently lost data when, after resigning, Robinson "wiped his computer." Opening Brief at 8. But even assuming that is true, a factory reset of Robinson's computer in January of 2024 lends no support to PromoShop's request for a preliminary injunction in May of 2025. The harm PromoShop purports to have suffered—a loss of data—bears no nexus to the relief it now seeks. *See Labrador*, 144 S. Ct. at 921 – 23 (preliminary injunctions "may go no further than necessary to provide interim relief to the parties," and should not be "more burdensome to the defendant than necessary to [redress] the plaintiff's injuries").

> (f)    **Daniels' alleged solicitation of PromoShop's customers in February '24 does not support PromoShop's request for a preliminary injunction.**

Finally, PromoShop claims that Daniels solicited its customers in February of 2024 by distributing a flyer that implied Jackalope was affiliated with PromoShop. Opening Brief at 8–9. But PromoShop is seeking a preliminary injunction for misappropriation of trade secrets, not improper solicitation. Whether Daniels' email was a "solicitation" or a response to an independent inquiry is a separate determination that does not bear upon the elements of trade secret misappropriation, and therefore, is not relevant to the pending Motion.

> (g)    **PromoShop bears the burden of disproving Robinson's, Luxenberg's, Daniels', and Lissauer's testimony.**

Jackalope has presented testimony rebutting PromoShop's misappropriation claims. This "shifts the burden to [PromoShop] to show that, contrary to the declarants' statements," Jackalope

misappropriated trade secrets. *BigRentz, Inc.*, 2023 WL 7496726, at *3. To do so, PromoShop must do more than show that its former employees are using their skills and experience to compete with PromoShop. "Merely using information obtained during [an employee's] association with [his former employer] in a new capacity does not rise to the level of misappropriation." *Trumble*, 166 Idaho at 151. If that was enough, an employee would have to "perform a prefrontal lobotomy on himself or herself" every time he or she went to work for a different company. *BigRentz, Inc.*, 2023 WL 7496726, at *3 (quoting *Northwest Bec-Corp*, 136 Idaho at 840). Something more is needed— and it is PromoShop's burden to clearly make that showing. *Lopez*, 680 F.3d at 1072.

**B.    There is no threat of irreparable harm.**

To justify a preliminary injunction, a movant must show that it faces a threat of irreparable harm. *Idaho Organization of Resource Councils*, 2025 WL 1237305, at *9. An "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). And the mere "'possibility' of irreparable harm is insufficient; irreparable injury must be 'likely' in the absence of an injunction." *BigRentz, Inc.*, 2023 WL 7496726, at *1 (citing *Winter*, 555 U.S. at 22).

PromoShop has not identified any actual or threatened irreparable harm that is likely to occur absent a preliminary injunction. PromoShop claims it could suffer "irretrievable loss of customers; permanent erosion of competitive advantage; ongoing disclosure of proprietary information; and reputational damage." Opening Brief at 15. But the record does not substantiate these purported fears. And, even if it did, these are not the kind of harms for which preliminary injunctions are an appropriate remedy.

First, the mere loss of business is not irreparable because it can be remedied through an award of damages. *BigRentz, Inc.*, 2023 WL 7496726, at *4 (stating plaintiff "fail[ed] to articulate

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 19**

why a damage award cannot remedy the loss of its business [that defendant's] trade secret misappropriation purportedly caused"). Second, PromoShop's claim that it will suffer reputational harm or an "erosion of competitive advantage" absent a preliminary injunction is purely speculative. Under certain circumstances, the loss of customer relationships and good will can support a showing of irreparable harm. *See Stuhlbarg Int'l Sales Co. Inc. v. John D. Brush & Co. Inc.*, 240 F.3d 832, 841 (9th Cir. 2001). But that is only true where such risks are substantiated by the record. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1181 (9th Cir. 2021) (quoting *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)); *see also Pruvit Ventures, Inc. v. Forevergreen International LLC*, 2015 WL 9876952, at *5 (E.D. Tex. Dec. 23, 2015) ("while reputational injury can be used to establish irreparable harm in certain circumstances, the showing of reputational harm must be concrete and corroborated, not merely speculative.") (internal citations and quotation marks omitted).

To support its allegation of reputational harm, PromoShop's claims Jackalope is "subject[ing] PromoShop customers to false representations and misl[eading] customers into believing PromoShop had rebranded its PromoShop Boise office, divert[ing] PromoShop business to Defendants, and [using] unsecured means to transmit data to PromoShop customers in violation of PromoShop's contractual duties." Opening Brief at 16. None of these allegations are supported by the record and none pertain to PromoShop's misappropriation claims—the only claims upon which it seeks a preliminary injunction.

Finally, PromoShop's lengthy delay in seeking a preliminary injunction cuts against its claim of irreparable harm. *Ensambles Hyson, S.A. de C.V. v. Sanchez*, 736 F.Supp.3d 871, 894 (S.D. Cal. 2024) ("An unexplained delay in seeking injunctive relief 'undercut[s] [a litigant's]

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 20**

claim of irreparable harm' and thus weighs against the issuance of an injunction.") (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015)); *see also Garcia*, 786 F.3d at 746 (affirming district court's conclusion that months-long delay in seeking an injunction "undercut [plaintiff's] claim of irreparable harm."). PromoShop waited over a year after the alleged misappropriation to file its lawsuit, *see* Complaint, Dkt. 1, and another two months to seek a preliminary injunction. That delay "implies a lack of urgency" and discredits PromoShop's claim that it will face irreparable injury if a preliminary injunction is not imposed. *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

**C.    The balance of equities and public interest weigh against a preliminary injunction.**

Finally, PromoShop has not shown that the balance of equities "tips sharply" in its favor or that an injunction is in the public interest. *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1190. For fifteen months, Jackalope has worked to develop relationships with customers and suppliers and expand its presence in the marketplace. In light of PromoShop's lengthy delay and Jackalope's vital interests in continuing its operations, neither equity nor the public interest would be served by granting a preliminary injunction.

**D.    Expedited discovery is not warranted.**

PromoShop also asks the Court to order expedited discovery on its misappropriation claims. Opening Brief at 1. PromoShop's own delay in seeking a preliminary injunction and its failure to serve discovery for the last three months cuts against this request.

## V.    CONCLUSION

For the foregoing reasons, Jackalope respectfully request that the Court deny PromoShop's Motion for Preliminary Injunction.

DATED May 16, 2025.

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 21**

GIVENS PURSLEY LLP


By  */s/ Donald Z. Gray*
     Donald Z. Gray
     Marcus H. Waterman
     Attorneys for Defendants


DAMIANI LAW GROUP A.P.C.


By *s/ Lisa J. Damiani*
     Lisa J. Damiani
     Attorney for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of May, 2025, I filed the foregoing document electronically through the CM/ECF system which caused the following parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic filing:

Dale Bolinger                                              ☒ CM/ECF:
Tifani Silveria                                                  dbolinger@hawleytroxell.com
HAWLEY TROXELL ENNIS & HAWLEY                tsilveria@hawleytroxell.com
LLP                                                          ☐ U.S. Mail
877 Main Street, Suite 200                             ☐ Facsimile:
P.O. Box 1617                                             ☐ Hand Delivery
Boise, ID 83701-1617                                   ☐ Overnight

*Attorneys for Promo Shop, Inc.*

Clint Robison                                             ☒ CM/ECF:
Benjamin Hase                                                crobison@ohaganmeyer.com
Brooke-Noelle D. Royes                                   bhase@ohaganmeyer.com
O'HAGAN MEYER                                            broyes@ohaganmeyer.com
21650 Oxnard Street, Suite 530                        ☐ U.S. Mail
Woodland Hills, CA 91367                              ☐ Facsimile:
                                                            ☐ Hand Delivery
*Attorneys for Promo Shop, Inc.*                        ☐ Overnight


                                            */s/*_____
                                            Donald Z. Gray
                                            Marcus H. Waterman

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 23**