UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PROMO SHOP, INC., a California corporation,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>JACKALOPE, INC., an Idaho entity; and JACKALOPE, LLC, an Idaho entity,<br><br>　　　　　Defendants. | Case No. 1:25-cv-00094-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

　　　　Pending before the Court is the Motion for Preliminary Injunction of Plaintiff Promo Shop, Inc. ("PromoShop") against Defendants Jackalope, LLC, and Jackalope, Inc. (collectively "Jackalope") (Dkt. 25). The Court held a hearing on the motion on February 26, 2026. For the reasons discussed below, the Court denies the motion.

## BACKGROUND

　　　　PromoShop is a "promotional merchandising and advertising company" with offices throughout the United States and Canada (Dkt. 1 at ¶ 1; Dkt. 29 at ¶ 2). PromoShop is a distributor, which acts as a middleman between suppliers and end-user customers of branded merchandise, commonly known as "swag" (Dkt. 30 at ¶¶ 5-6). Guillermo Kahan founded PromoShop in 1998 and recruited Kris Robinson to join PromoShop in April 2002 (Dkt. 29 at ¶ 3; Dkt. 32-11 at ¶ 14).

　　　　In 2005, Robinson established a Boise-based PromoShop (Dkt. 29 at ¶ 5). In the Boise office, Robinson worked closely with other PromoShop employees including Kylie Daniels, Boise's account manager; Kimberly Luxenberg, PromoShop's director of national accounts; and Courtney Lissauer, an associate account executive for PromoShop (collectively "Former

**MEMORANDUM DECISION AND ORDER - 1**

Employees") (*id.* at ¶ 8). Although Robinson worked with Luxenberg and Lissauer, they were not Boise-based; rather, Luxenberg worked for PromoShop between New York City and San Diego, and Lissauer worked from New York City, where both Luxenberg and Lissauer began their careers in the industry (Dkt. 32-2 at 3).

Eventually Kahan and Robinson's relationship soured, culminating in a flurry of events occurring in January 2024, although the timeline in the record is not exactly clear about when certain events occurred. Sometime around January 15, Kahan and Robinson were at a trade show in Las Vegas, and Kahan confronted Robinson about a fraudulent expense report and requested Robinson's resignation[1] (Dkt. 29 at ¶¶ 15-16). According to Robinson, the next day—January 16, he met with Kahan and PromoShop's president, Kate Alavez, and told them that he intended to start his own promotional company; his "team," including Luxenberg and Lissauer, would likely be joining him; and he "wanted to continue to work with PromoShop" until the end of January 2024 (Dkt. 32-11 at ¶ 33). Robinson attests that "both Kahan and Alavez agreed with this approach" (*id.*).

Contrary to Robinson's belief that PromoShop agreed to continue employing him through January 2024, Kahan sent a company-wide email on January 17 announcing that Robinson was no longer affiliated with PromoShop (Dkt. 32-15). Then, on either January 16 or 17, "PromoShop locked the [Former] Employees out of their PromoShop electronic accounts, systems, and emails" (Dkt. 30 at ¶ 28; Dkt. 32-1 at ¶ 5; Dkt. 32-2 at ¶ 11). Upon learning that their access had been denied, Luxenberg requested access to a folder on her desktop, and Daniels requested access to

---

[1] Kahan attests he confronted Robinson on January 15, 2024; meanwhile, Robinson indicates this confrontation may have occurred on January 13 (*compare* Dkt. 29 at ¶ 15 *with* Dkt. 32-11 at ¶ 31).

MEMORANDUM DECISION AND ORDER - 2

her emails (Dkt. 30 at ¶¶ 30-31). In response, Alavez instructed that Luxenberg be allowed access to her "personal writings" and that Daniels be allowed access to her emails (*id*. at ¶ 31). After this series of events, PromoShop terminated Luxenberg's employment on January 23, and on January 25, Robinson, Lissauer, and Daniels resigned from PromoShop (Dkt. 1 at 18; Dkt. 30 at 11).

PromoShop alleges the Former Employees misappropriated PromoShop's confidential information and trade secrets. After analyzing Lissauer's and Daniel's PromoShop-issued computers, PromoShop's forensic computer expert concluded that Daniels and Lissauer accessed and copied the following PromoShop information:

1. Lissauer connected her computer to an external Google account and accessed 1,845 folders and files, 448 of which contained the name "promoshop" or "promo shop" (Dkt. 28 at ¶ 9).

2. Daniels plugged a USB drive into her computer on December 15, 2023, and again on January 17, 18, 25, and 30, 2024; accessed 322 folders and files; and copied "most" of them between January 17 and 18 (*id.* at ¶¶ 10-11).

3. On January 25, 2024, Daniels used her personal Gmail account multiple times in proximity to interactions with PromoShop's shopify.com account (*id.* at ¶¶ 13, 16(d)).

4. On January 27, 2024, Lissauer plugged a USB drive into her computer to access a file entitled "Courtney Lissauer EAE Offer Letter 2023.09.07.pdf" (*id*. at ¶ 16(b)).

Also, on January 22, 2024, the administrative login credentials for PromoShop's Boise Shopify account were changed to Daniels' personal Gmail address (Dkt. 1 at 17; Dkt. 30-7; Dkt. 32-11 at 9). And, on January 27, Robinson performed a factory reset of his PromoShop-issued laptop before returning it (Dkt. 1 at 15; Dkt. 28 at ¶ 14).

Meanwhile, on January 19, 2024, Robinson incorporated Jackalope, Inc., in Idaho after dissolving Jackalope LLC, an Idaho company which he had previously formed in June 2023

**MEMORANDUM DECISION AND ORDER - 3**

(Dkts. 27-2; 27-3). Jackalope is—like PromoShop—a promotional products distributor. Following the termination of their PromoShop employment, the Former Employees became affiliated with Jackalope in the same or similar capacities as with PromoShop: Luxenberg is Jackalope's president; Robinson is its vice president; and Lissauer and Daniels are directors of national accounts (Dkt. 32-11 at ¶ 1; Dkt. 32-2 at ¶ 1; Dkt. 32-9 at ¶ 1; Dkt. 32-1 at ¶ 1). Robinson and Luxenberg, however, both attest that Jackalope did not begin transacting business until February 1, 2024 (Dkt. 32-11 at ¶ 47; Dkt. 32-2 at ¶ 17).

More than a year later, on February 20, 2025, PromoShop filed this action against Jackalope. It alleges eight claims for relief, including claims for misappropriation of trade secrets in violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, and the Idaho Trade Secret Act (ITSA), §§ 48-801-807 (*see* Dkt. 1). Two months later, on April 25, 2025, PromoShop moved under Rule 65 of the Federal Rules of Civil Procedure to enjoin Jackalope (Dkt. 25). In that motion, PromoShop argues only that it is likely to succeed on the merits of its state and federal trade secret claims (Dkt. 26 at 13-15). Accordingly, the Court's analysis focuses on these claims.

In support of PromoShop's preliminary injunction motion, it identifies the following "folders and files" of information as "trade secrets":

- *Account Files for each customer*. The complete account file for every Boise customer (including billing files, payment files, financial information)

- Desktop *Files*. Every file located on the Boise Office computer desktop

- Inventory *and Order Reports*. Inventory reports, order breakdowns, and customer order spreadsheets

- QuickBooks *data*. All program data, including customer contact data and tax information

- *Purchase Orders*. Every purchase order and sale document

**MEMORANDUM DECISION AND ORDER - 4**

- *Marketing Files*. Every PromoShop marketing file (including case studies, pitch books, profile reports, tradeshow files, showcase files) (these include supplier lists, details of sample products, contracts, and quotes for products and services)

- *Boise Business Forms*. Every Boise Office custom electronic business form developed by PromoShop (its entire library) (including price lists and forms for quotes, pricing, packaging, shipping, storage information)

- *Boise Security Information*. Every file setting forth Boise security information, including computer passwords, user identification information, e-store data

- *Employee Personal Information Files*

- *Boise customer contracts*

- *Customer Product Files*. For each customer, including customer specifications; pricing lists, preferences and options, access credentials, and design files (e.g., logos, guidelines)

- *Customer Order Files*. For each customer NDAs, non-disclosure agreements, order acknowledgments

(*id.* at 7; Dkt. 30 at ¶ 35).[2]

PromoShop asserts it maintains this information as secret. In support, it points to its "implementation of passwords, security policies and procedures together with confidential agreements" (Dkt. 26 at 14). Specifically, it identifies the following policies or agreements: its "Information Security" policy regarding mobile devices (Dkt. 30-1); its "Data Security – Required Best Practices" (Dkt. 30-2 at 1); its "Data Protection Policy" (Dkt. 30-2 at 2); and the Former Employees' "Confidential Information and Creative Works Agreement" (Dkt. 30-3 at 1-5).

---

[2] PromoShop identifies a somewhat different list of alleged "trade secrets" in its proposed order, including customer account files, customer lists, QuickBooks data, marketing information, inventory information, workflow documents, operational and shipping documents, financial information, design files, and contracts.

**MEMORANDUM DECISION AND ORDER - 5**

## LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a party may obtain injunctive relief before final judgment in certain limited circumstances. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A preliminary injunction serves the purpose of "preserv[ing] the status quo ante litem pending a determination of the action on the merits." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980); Fed. R. Civ. P. 65. It is an extraordinary remedy that should be awarded only "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

The movant must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. The movant must carry his burden "by a clear showing." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). The first factor "is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Further, the "possibility" of irreparable harm is insufficient; irreparable injury must be "likely" in the absence of an injunction. *Winter*, 555 U.S. at 22.

The Court may apply a "sliding scale" standard, "allowing a stronger showing of one element to offset a weaker showing of another." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). Under this approach, "serious questions going to the merits" and a hardship balance that "tips sharply toward the plaintiff" can support issuance of an injunction. *Alliance for the Wild Rockies*, 632 F.3d at 1132; *see also N. D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024). A "serious question" is one that "cannot be resolved one way or the other at the hearing on the injunction because [it requires] more

deliberative investigation." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

## ANALYSIS

### A. Trade Secrets

As noted above, PromoShop seeks an injunction based solely on its trade secret claims under the DTSA and the ITSA. Courts may analyze claims brought under the DTSA and state trade secret acts, such as the ITSA, together because the elements are substantially similar. *See, e.g.*, *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). Accordingly, the Court analyzes PromoShop's motion under the ITSA.

Under Idaho law, "[a]ctual or threatened misappropriation may be enjoined." I.C. § 48-802(1). A trade secret is defined as "information, including a formula, pattern, compilation, program, computer program, device, method, technique, or process," that:

> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

I.C. § 48-801(5).

Factors to be considered in determining whether information is "readily ascertainable" include:

> (1) the extent to which the information is known outside [the plaintiff's] business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 456 P.3d 201, 218 (Idaho 2019) (quoting RESTATEMENT OF TORTS § 757, comment b (1939); *see also Basic Am., Inc. v. Shatila*, 992 P.2d 175, 184 (Idaho 1999) (same).

Generally, misappropriation of a trade secret occurs when a person, who knows or has reason to know the trade secret was acquired by improper means, acquires the trade secret or when a person with the requisite knowledge of the trade secret uses or discloses it without express or implied consent. *See generally* I.C. § 48-801(2) (defining misappropriation). To prevail on a misappropriation claim, PromoShop must show that (1) a trade secret existed; and (2) Jackalope acquired, disclosed, or used the trade secret by improper means. *Trumble*, 456 P.3d at 217; *Northwest Bec-Corp v. Home Living Serv.*, 41 P.3d 263, 268 (Idaho 2002); *Basic Am.*, 992 P.2d at 183; *see* I.C. §§ 48-802(1), -801(2), (5); *see also* 18 U.S.C. §§ 1836(b)(1), 1839(3) (imposing similar requirement).

**B.      Likelihood of Success on the Merits**

    **1.      Alleged Trade Secrets**

The Court considers whether the information PromoShop has identified is a protectable trade secret. When making a claim for the wrongful use of trade secrets, the plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge." *Basic Am.*, 992 P.2d at 188 (quotation omitted). "Without a proven trade secret there can be no misappropriation, even if the defendants' action was wrongful." *Id.* at 183.

Here, PromoShop conflates confidential information with trade secrets. Repeatedly, PromoShop refers to these two types of information synonymously (*see, e.g.*, Dkt. 26 at 20) (seeking injunctive relief to protect trade secrets and confidential information). These two

concepts, however, are not coextensive; information may be confidential but that does not necessarily make the information a trade secret.

For example, PromoShop identifies as "trade secrets" information such as employee personnel files and customers' contracts, agreements, purchase orders, and financial information. Although this information may be confidential, it is not secret. Necessarily, customers and employees are privy to their own information so that information is not secret as to only PromoShop. Further, some of the information PromoShop identifies as a trade secret is broadly described as "files" and "forms," including for example "every" desktop file, "all" Quickbooks data, "every" business form, and "every" marketing file (Dkt. 26). These descriptions, however, are not sufficiently particular to determine whether these items (individually or as a compilation) are or contain any protectable trade secrets.

During oral argument, PromoShop's counsel articulated for the first time alleged protectable trade secrets in PromoShop's "curated files,"[3] a Shopify account; and a Formsite software system. The gist of counsel's oral argument was that these items contain "compilations" of customer information that PromoShop spent "substantial effort building" and that "embody years of customer specific data workflows and configurations." There is, however, limited evidence in the record about these items. For example, the evidence about the Shopify account is that "Jackalope's agents used the login information of PromoShop's Boise Shopify account to re-route a PromoShop customer's order information to [Daniels'] personal unsecured email address" (Dkt. 30 at ¶ 42). Regarding the Formsite software, the record shows that PromoShop uses the Formsite software "to carry out and manage many of its e-commerce order fulfillment

---

[3] These files appear to be the same as "customer product files" referred to in PromoShop's submissions (*see, e.g.*, Dkt. 30 at ¶ 35.k).

**MEMORANDUM DECISION AND ORDER - 9**

requirements," including "receiving and storing inventory, processing the order, picking and packing items, shipping the order, and processing returns" (*id.* at ¶¶ 5-6).

There is no evidence, however, that the information contained in the Shopify account and the Formsite software qualifies as PromoShop's trade secrets. For example, there is no definitive description of this information or evidence to support the proposition that it is not readily ascertainable by proper means. Although a trade secret may be "a unique combination of generally known elements which was not in the public domain," *Basic Am.*, 992 P.2d at 189, PromoShop has failed to make a clear showing that any of the information it identifies is a trade secret, including the information in the Shopify account, Formsite software, or PromoShop's "curated" files.

Further, to identify a trade secret, the Court is required to evaluate specific information, not the broad categories or storage locations of information to which PromoShop points. *See, e.g.*, Idaho Code § 48-801(5). Although the evidence shows the potential transfer or retention of certain repositories of information, that alone does not establish Jackalope took protectable trade secrets from those repositories. Viewed *collectively*, the record supports that certain Former Employees accessed, copied, or retained identifiable containers of information that may have had a broad array of confidential files within them (including a .PST file, Google Drive repositories, a broad OneDrive-synced dataset copied to an external drive, and a Shopify shipping report) (Dkt. 32-9 at ¶ 15; Dkt. 28 at ¶¶ 9-12; Dkt. 32-1 at ¶ 9; Dkt. 28 at ¶ 13). This evidence, however, is not enough to establish a trade secret.

That lack of clarity regarding what information may qualify as a trade secret is compounded by the evidence concerning PromoShop's information-handling practices. PromoShop relies on written confidentiality policies and the former employees' Confidential Information and Creative Works Agreements as evidence of efforts to designate and protect

information as confidential (Dkt. 30 at ¶¶ 19-26; Dkt. 30-1; Dkt. 30-2 at 3-4; Dkt. 30-3). Defendants respond, however, that customer and supplier identities were publicly available through PromoShop's website and industry sources and were routinely disclosed in the ordinary course of business, and that customer contact information was commonly maintained on personal devices (Dkt. 32 at 3-6). On this record, the Court cannot conclude for purposes of preliminary relief that PromoShop has shown the particular information it seeks to protect was consistently maintained in a manner reflecting reasonable secrecy measures, as opposed to being shared or used in ways that blur the line between protectable, non-public compilations and ordinary-course business information.

The Court recognizes PromoShop's contention that trade-secret protection is not "all or nothing," and that limited disclosure of some aspects of customer or supplier information does not necessarily destroy protection for other non-public compilations or business insights. Even so, that principle does not relieve PromoShop of the obligation to identify what the asserted compilations are in this case and what non-public attributes supply their alleged independent economic value. On the current record, the asserted categories remain too indeterminate to permit the Court to determine what the alleged secret is; what is readily ascertainable; and what constitutes generalized know-how or relationship-based goodwill.

        **2.**      **Alleged Misappropriation**

Even assuming PromoShop had identified protectable trade secrets, it must still show a likelihood of misappropriation—i.e., improper acquisition, disclosure, or use of a trade secret. Idaho Code § 48-801(2). Evidence suggesting access to or retention of asserted trade secrets, without competent evidence supporting a non-speculative inference of likely disclosure or competitive use of identified trade secrets, is generally insufficient to justify extraordinary

injunctive relief—particularly where the record supports alternative explanations for customer movement or competitive activity. *See Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1207 (E.D. Cal. 2020) (recognizing that "mere possession of trade secrets by a departing employee," without more, is insufficient to establish misappropriation or show injury required for temporary restraining order); *BigRentz, Inc. v. KGM Enters., LLC*, No. 1:22-CV-00430-AKB, 2023 WL 7496726, at *3-4 (D. Idaho Nov. 13, 2023) (denying preliminary injunction where plaintiff failed to carry burden on misappropriation on preliminary record despite allegations of access, including where record reflected customers chose to follow employee due to existing relationships rather than improper solicitation or use of secrets); *Northwest Bec-Corp*, 41 P.3d at 268-69 (affirming summary judgment where specific denials of misappropriation and evidence of independent marketing plan provided credible alternative explanations for movement of approximately ninety customers).

The present record contains evidence that during January 2024, certain Former Employees accessed or copied PromoShop materials (Dkt. 28 at ¶¶ 11-14; Dkt. 32-1 at ¶¶ 6-9; Dkt. 32-9 at ¶¶ 14-16; Dkt. 32-11 at ¶ 46). These facts are probative of access and copying and may, depending on context, bear on intent. At this stage, however, the Court must be able to draw a non-speculative inference that improper disclosure or competitive use of a defined trade secret is likely. On this record, the evidence does not establish that Jackalope used or is likely to use or disclose PromoShop's trade secrets. The forensic evidence described in the declarations identifies access and copying events; it does not show, however, that such materials were deployed in competition or disclosed to third parties. Indeed, PromoShop's example in the record of misuse (a fraudulent client letter) was directly rebutted by Jackalope's opposition (the client verifying letter authenticity).

**MEMORANDUM DECISION AND ORDER - 12**

Idaho law also permits injunctive relief for "threatened" misappropriation. Idaho Code § 48-802. PromoShop argues the record supports threatened misappropriation, including through alleged changes to online credentials (*see* Dkt. 32 at 7-18). Even accepting that credential changes may support an inference of unauthorized access, the present record still does not bridge the gap to likely improper disclosure or competitive "use" (or threatened use) of identified trade secrets. Although the information was allegedly improperly obtained in January 2024, there is no direct evidence in the record of improper use, despite that the alleged conduct occurred two years ago

Further, the Court declines to equate customer movement or Jackalope's ability to service accounts with trade secret use where the record also supports alternative explanations grounded in pre-existing relationships, general industry knowledge, and publicly available supplier information. While PromoShop contends that the "gross revenue from its top Boise Office customers since January 25, 2024 . . . has declined approximately 85%," that decline could be due to longstanding relationships, not misappropriation. For these reasons, the Court concludes that PromoShop has failed to establish a likelihood of proving Jackalope misappropriated its trade secrets for purposes of a preliminary injunction.

## C. Irreparable Harm, Balance of Equities, and Public Interest

None of the other factors—irreparable injury, the balance of equities, and the public interest—weigh sufficiently in PromoShop's favor to overcome its inability to clearly show the most important factor, i.e., a likelihood of success on the merits. *See Garcia*, 786 F.3d at 740 (noting likelihood of success on merits most important factor). Although the public interest supports protecting trade secrets, *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 483 (1974), factual questions exist whether any of the information Jackalope obtained and used was, indeed, a misappropriated trade secret.

Further, PromoShop has not demonstrated that irreparable injury is likely in the absence of a preliminary injunction. Generally, an "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). PromoShop acknowledges that it can quantify at least some of its injury. Again, it asserts that its "gross revenue from its top Boise Office customers since January 25, 2024 . . . has declined approximately 85%" (Dkt. 29 at ¶ 27). A damage award can remedy this alleged injury. The only other injury PromoShop identifies is alleged damage to its goodwill and reputation. In support, Kahan attests that seven of PromoShop's Idaho-based customers sought clarification whether PromoShop is affiliated with Jackalope (*id.* at ¶ 33). Without more evidence, however, the Court cannot conclude the inquiries warrant the extraordinary relief requested.

Moreover, PromoShop's delay in filing this lawsuit until more than a year after the alleged wrongful conduct and delay in seeking a preliminary injunction for another two months thereafter seriously undercuts its argument that it will suffer irreparable harm absent injunctive relief. Courts regularly view a delay in seeking a preliminary injunction as indicative of a lack of urgency and irreparable harm. *See, e.g.*, *Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay in seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief."). Although PromoShop's counsel attributed its delay to an unsuccessful mediation, nothing in the record indicates PromoShop delayed filing this action and seeking injunctive relief because the parties were attempting to mediate their dispute.

**MEMORANDUM DECISION AND ORDER - 14**

Because PromoShop has failed to make a clear showing it is entitled to preliminary injunctive relief, the Court denies its motion for such relief.[4]

## ORDER

For the reasons set forth above, Plaintiff PromoShop, Inc.'s Motion for Preliminary Injunction (Dkt. 25) is **DENIED**.

DATED: March 03, 2026

Amanda K. Brailsford
U.S. District Court Judge

---

[4] PromoShop also requests expedited discovery in aid of its requested injunctive relief (Dkt. 26 at 20). Because the Court denies preliminary injunctive relief, it denies the request for discovery without prejudice.

**MEMORANDUM DECISION AND ORDER - 15**